STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
DOCKET NO DOVSC-07-32

STATE OF MAINE

v.

ROY LEMIEUX

RECEIVED & FILED

NOV 3 0 2009

PISCATAQUIS COUNTY
Clerk's Office

ORDER

On July 15, 2008, the defendant was convicted by jury verdict of Count I, theft class D (victim Jason Tyler) and Count IV, theft class C (victim Brian Campbell). He had originally been charged with additional counts II, theft class E (victim Theresa Daughton), and III, theft class E (victim Michael Bunker). The Court granted the defendant's motion to acquit on Count II at the close of his case because the state had failed to prove that if the defendant took possession of that victim's property it was done without her permission. The jury returned a guilty verdict with regard to Count III but the Court granted the defendant's motion for acquittal on that count as well. Count I had originally expressed a class C offense, but it was reduced to class D during trial by stipulation. The Court gives the following overview of the evidence and then will focus on what findings a rational juror could have made.

The incident that gave rise to these charges was somewhat complicated. Central Maine Power had hired Jason Tyler's company to clear its right of way. The company had sent out letters to abutting landowners notifying them of the clearing and giving them an opportunity to claim wood that was cut on their land in the process of clearing the right of way. According to CMP's agreement with Tyler, he would be able to keep any wood that was not claimed. Mr. Lemieux, a woodcutter, is a resident of the area

who was aware that the right of way was being cleared and that Mr. Tyler was keeping unclaimed wood. As the clearing progressed, Mr. Lemieux approached Bunker and Campbell in separate phone calls on Friday, March 9, 2007, expressed to them that their wood was being stolen and asked them if they wanted to sell it to him. Mr. Campbell declined and expressed that he needed to check first, but had made arrangements for Mr. Tyler to sell it and reimburse him. Mr. Bunker's response was more encouraging, even if one believes his version of the conversation as opposed to defendant's version. Mr. Bunker testified that the property had been his mother's, that she was deceased, and he was the personal representative of her estate and had not received a letter from CMP. He told defendant that he certainly was interested in selling the wood to him but wanted to find out what was going on and that he was going to wait until Monday to make a decision. He said, "I'm willing to sell it to you when we settle everything with CMP and see exactly what's going on." He also testified that the reason he wanted to wait was to make sure CMP had not already made other arrangements and selling to another would "screw the whole deal up." In fact Bunker spoke with Tyler, but was unable to contact CMP successfully. Mr. Lemieux testified that Bunker said he would sell him the wood, without reservation. Later that day, Mr. Lemieux secured the services of Mr. Simmons who transported wood. At defendant's direction, he went to the site of the clearing operation, loaded a pile of logs that had blue markings on the ends of the logs, and transported them to his residence.

The pile of logs that Mr. Simmons loaded came from trees that Tyler's crew felled on property within the right of way but owned by Daughton, Campbell, the estate of Bunker's mother, and maybe Pike Industries. The lower grade pulp cut from this area was located in piles set apart from the logs and Mr.Tyler marked the end of the logs himself in part because Mr. Lemieux had also visited him and Tyler wanted to mark the

logs for security reasons. While the defendant and Simmons were loading the logs, defendant sliced the blue paint from each log and painted the tip with red and wrote "Bunker" on one of the logs. The most valuable of the logs came from a large pine tree located on what was probably Campbell property that was felled and cut into four logs.

On the following Saturday or Sunday Defendant contacted Mr. Bunker for the first time since their Friday conversation and said, "Mike, you don't have to worry, I've taken your wood." He went on to say that he got it first and hid it. Mr. Bunker did not report a theft and the wood was seized by the State Police during the weekend. By Sunday, Mr. Campbell became aware the logs were missing and he called Mr. Lemieux who admitted that he had taken the log pile to protect the landowners including Bunker, and said Campbell's logs must have been mixed in. Defendant said the wood was safe and he could match the logs to the stump and there would be no problem. After seizure, the wood was eventually sold and the proceeds were distributed to Tyler, Campbell, and Bunker.

ANALYSIS

In deciding whether a motion for judgment of acquittal should be granted, the Court must view the evidence from a standpoint that is favorable to the state and assume the validity of the prosecution's evidence, and then determine whether there was relevant evidence from which the jury could have properly concluded that the accused was guilty beyond a reasonable doubt. *State v. Blier,* 371 A.2d 1091 (Me 1977). After the jury verdict finding the defendant guilty of counts I, III, and IV, the Court properly granted a motion to acquit with regard to Count III because there was insufficient evidence of intent to deprive with regard to this count. In viewing the evidence in a manner that was most favorable to the State, Mr. Lemieux removed Mr. Bunker's logs on Friday, after having a discussion earlier in the day in which Mr.

Bunker told Lemieux that he was willing to sell him the logs, but only after he first checked with the forester and CMP. Mr. Lemieux removed the blue markings from the logs when he took them and painted the tips red and wrote "Bunker" on the end of one. He then called Mr. Bunker and told him not to worry, that he had the logs and they were hidden. From this, one could rationally conclude that Mr. Lemieux had exercised unauthorized control over the logs from Friday until they were seized by the police, but not that he did so with the intent to deprive Mr. Bunker of the logs. Because he wrote Bunker's name on the end of one of the logs in the pile and changed their marking color as he took possession of them, and soon thereafter called Mr. Bunker with the news, a rational fact finder could not find, as is required at 17A MRSA 352(3) that it was his conscious object to withhold the logs "permanently or for so extended a period or to use under circumstances that a substantial portion of (their) economic value, or the use and benefit of (the logs) would be lost."

Next, was there sufficient evidence for a conviction on Count I, in which it is alleged that Mr. Lemieux stole property from Mr. Tyler? This charge could only be proved if the logs were to be considered his property, not the property of a non-responding landowner such as Mr. Bunker or Ms. Daughton. In order to convict Mr. Lemieux of this count, the State must prove that the logs were the "property of another". According to 17-A MRSA 352 (4), "property of another" includes property in which any person or government other than the actor has an interest that the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property. In this case, Mr. Tyler's property interest in the logs arose only because of a contractual agreement that he had with CMP, but not with the actual owner of the trees from which the logs were cut. No evidence was introduced concerning the creation of the right-of-way and any rights CMP may have had in disposing of trees growing on

the right-of-way. In general, testimony indicated that the land on which the right-of-way was located remained the property of the owner of the real estate and that CMP had a right-of-way for the purpose of the transmission of electricity. Although Mr. Tyler's right to possess the wood from right of way trees was superior to CMP's, it has not been proven that it was it was superior to the right of non-responding landowners. Bas on this analysis, the Court grants the motion to acquit with regard to Count I.

Finally, the Court must address the motion with regard to Count IV, in which the defendant was charged with theft of the property of Brian Campbell, of a value in excess of $1,000. As in the Bunker count, it is clear that the state proved that Mr. Lemieux exercised unauthorized control over wood that had been cut on the right-of-way. The only questions are whether he had the intent to deprive the owner of the wood and whether its value exceeded $1,000.

Fundamental to this analysis is whether the State identified what Campbell wood the defendant obtained. Mr. Campbell's testimony as to the location of the large pine tree that yielded the most valuable logs taken by the defendant was convincing and a juror could properly have concluded that the logs were Mr. Campbell's property. Of the pile of logs, belonging to Campbell, Daughton, Bunker, and Pike, the four biggest were from this tree and Mr.Tyler testified that the value of the entire pile was between $2,000 and $4,000. Mr. Campbell testified that he thought the value of his pine logs was between $2,000 and $3,000, and Mr. Packard, the scaler who was going to buy the logs, testified that he had been interested in three and their value was approximately $1,200. From this testimony, a reasonable juror could have concluded beyond a reasonable doubt that the value of the logs was in excess of $1,000. Additionally, because there was no evidence that any potential owner gave Mr. Lemieux permission to take the logs, a juror could reasonably conclude that Mr. Lemieux exercised unauthorized control over

logs having a value in excess of $1,000, the property of another. The final element of proof necessary for conviction, however, is whether Mr. Lemieux had the intent to deprive the owner of the property.

One could certainly have listened to the testimony and carefully considered the evidence and concluded that Mr. Lemieux was an obstinate person who had a strong dislike for Central Maine Power Co. and the way they were conducting the clearing of the right of way in this area. As a result, thinking that he was acting as a savior to abutting landowners, and believing that he had the permission of Mr. Bunker, who he thought probably owned most of the logs, Mr. Lemieux loaded the logs and took them to a safe location. One could also have concluded that he then began to arrange for the sale of the logs and, had he not been interrupted, would have remitted to the owner(s) an amount reflective of the value of the logs. According to this version, the State would have failed to prove intent to deprive and acquittal would have been in order.

Although the above description is a logical interpretation of the evidence in, rational jurors could reach other conclusions, beyond a reasonable doubt. Based on the evidence, one could conclude as follows:

Mr. Lemieux knew the big pine belonged to Mr. Campbell, based on the latter's testimony that Mr. Lemieux was aware of a survey that placed the tree on Campbell's side of a property line by five feet and that Mr. Lemieux had been aware of the tree because of its outstanding size.

Mr. Lemieux cut off Tyler's markings and added his own, with a different color of paint, putting Bunker's name on a log as a ruse.

Mr. Campbell explicitly told Mr. Lemieux on the Friday before the taking that he did not want to sell any wood to Lemieux at that time and was going to look at what

had been cut over the weekend. When Mr. Campbell went to inspect on Sunday, he noticed the logs were missing.

Mr. Lemieux arranged for the logs to be taken and hidden and, unlike the Bunker situation, he did not contact Mr.Campbell to tell him the logs were safe.

Mr. Lemieux was in a hurry to sell the logs and insisted that Mr. Packard look at them on Sunday morning, before Mr. Campbell called to ask about the logs.

A reasonable juror could make the above factual findings beyond a reasonable doubt, conclude that the State had proved intent to deprive, and thereby find the defendant guilty of class C theft. \

The entry is:

Motion Granted with regard to count I, the conviction is vacated, and the defendant is acquitted of the charge. The motion is Denied with regard to count IV.

Dated: November 19, 2009

WILLIAM ANDERSON
JUSTICE, SUPERIOR COURT

Charles Cox. Esq
for def.
11/19

P. Chris Almy
for State

STATE OF MAINE
PENOBSCOT, SS.

Walter S. Cobb, II

v.

State of Maine

SUPERIOR COURT
Docket No. CR-07-32
JLH - PEN - 11/8/2010

FILED

NOV 08 201

PENOBSCOT JUDICIAL CENTER
PENOBSCOT COUNTY SUPERIOR COURT
BANGOR DISTRICT COURT

Decision and Judgment

Hearing was held on the pending petition for post-conviction review. At the hearing, the petitioner was present with post-conviction counsel.

In the underlying criminal action, the petitioner, Walter S. Cobb, II, was indicted for robbery (count 1), *see* 17-A M.R.S. § 651(1)(E); burglary (count 2), *see* 17-A M.R.S. § 401(1); possession of a firearm by a prohibited person (count 3), *see* 15 M.R.S. § 393(1)(A); reckless conduct with the use of a firearm (count 4), *see* 17-A M.R.S. §§ 211(1), 1252(4); criminal threatening with the use of a firearm (count 5), *see* 17-A M.R.S. §§ 209(1), 1252(4); theft by unauthorized taking (count 6), *see* 17-A M.R.S. § 353(1)(A); burglary of a motor vehicle (count 7), *see* 17-A M.R.S. § 405(1); and unauthorized use of property (count 8), *see* 17-A M.R.S. § 360(1)(A). These charges arose largely out of a March 2003 armed home invasion of the residence of Jeremy Hart and Kristen Hart. During the criminal proceeding, Cobb was represented by Kirk D. Bloomer, Esq. Cobb waived his right to trial by jury on count 3. The remaining charges were the subject of a jury trial held in February 2004. The jury found the defendant guilty of those seven charges. On count 3, based on the evidence presented to the jury and the jury's verdicts on the other counts, the court found the defendant guilty. The following month, the court imposed sentence on all charges. On counts 1 and 2, the sentences were 25 years incarceration, with lesser sentences on the remaining counts. All

1

sentences were to be served concurrently. On appeal, the Law Court affirmed the judgment and the sentences.[1]

Cobb subsequently filed the instant petition for post-conviction review. The petition as amended sets out a number of claims. However, as is reflected in his written post-trial argument, he has pursued only three contentions. In that written argument, Cobb contends that he was deprived of effective assistance of counsel because trial counsel failed to secure testimony from an alibi witness; because counsel failed to take prophylactic steps during trial to prevent the introduction of evidence of Cobb's felony criminal record and his association with a motorcycle club; and because counsel failed to develop forensic evidence that would have supported an alternative suspect theory.

In order to establish a denial of the constitutional right to effective assistance of counsel, a post-conviction petitioner must prove (1) that there has been "serious incompetency, inefficiency or inattention of counsel-performance of counsel which falls . . .below that which might be expected from an ordinary fallible attorney", and (2) that the ineffective representation "likely deprived the defendant of an otherwise available substantial ground of defense[]." *State v. Brewer*, 699 A.2d 1139, 1143-44 (Me. 1997).

### Alibi evidence

The central issue in the criminal action was whether the state established that Cobb participated in the commission of the crimes associated with the home invasion. Three persons were involved in the commission of the crimes. Two of them testified at trial as prosecution witnesses. There, they acknowledged their own participation and also identified Cobb as the third perpetrator.

Cobb argues here that Bloomer failed to conduct an adequate pretrial investigation that would have developed alibi evidence. As part of the obligation to provide a constitutionally adequate caliber of representation, defense counsel owes a duty to conduct a reasonable pretrial investigation. *Doucette v. State*, 463 A.2d 741, 745 (Me. 1983).

---

[1] Cobb had applied for leave to appeal from sentence. The Supreme Judicial Court granted that petition and consolidated Cobb's challenges to the sentences with his appeal from the convictions themselves.

2

Cobb alleges that prior to trial, he provided information about an alibi witness to Bloomer and a private investigator, Joseph Lamagna, whom Bloomer secured to assist in Cobb's defense. The crimes charged against Cobb occurred during the morning hours of Sunday, March 9, 2003. At the post-conviction hearing, Cobb testified that during the period of time when the crimes were committed, he was with one Robin Boyington. Cobb stated that he had known Boyington for some period of time and met her at Angie's Pub, a bar in Portland, during the evening of March 8. The two eventually went to a motel and had sex. Cobb testified that he left the motel at 11:00 a.m on March 9, by which time the crimes had been committed. Cobb argues here that he was deprived of effective assistance of counsel because Bloomer did not secure Boyington as an alibi witness.

The court finds as a factual matter that Cobb did not provide this alibi information to Bloomer and Lamagna in the way he described at the post-conviction hearing. The court places greater weight on the testimony of Bloomer and Lamagna. Both testified that Cobb told them that he was in Portland during the evening of March 8 and that he met a woman named Robin at Angie's Pub. However, Cobb was unable to provide them with Robin's last name or an address where she could be located. According to Bloomer and Lamagna, Cobb told them that they had oral sex in a car and that he then went to the home of Julie Miller, with whom Cobb has a child.

Lamagna followed up on this information. He went to Angie's Pub and spoke with the manager but was unable to obtain more information about the identity and whereabouts of Robin. Lamagna even attempted to look at video surveillance tapes, but the images from March 8 no longer existed. Because Lamagna took those steps to find Robin based on the limited information that Cobb gave him, it stands to reason that if Lamagna had the better contact information that Cobb says he provided, Lamagna would have used that information because it would have been easier to find her that way. That Lamagna did not conduct a search based on the data that Cobb claims he provided suggests that Cobb's account is not true. Ultimately, without a last name or an address, Lamagna was unable to find Robin.

Lamagna continued in his attempts to develop Cobb's alibi information by contacting Miller. In a telephone conversation with her, Miller told Lamagna that Cobb

3

was not with her on March 8 or 9. She was certain that she last saw Cobb in November 2002 and that she remembered the date of that contact because it was related to their son's birthday.

At the post-conviction hearing, Cobb stated that he told Bloomer and Lamagna that he did not want them to pursue Miller as an alibi witness because his relationship with her was difficult. If this testimony is true, it means that Bloomer and Lamagna failed to locate a favorable alibi witness that Cobb *did* disclose to them -- and that they did locate and pursue a witness who Cobb said would *not* be helpful as a defense witness. Cobb's contention to this effect is not credible. There is no dispute that Bloomer and Lamagna realized the importance of developing alibi evidence. The evidence then shows that Bloomer and Lamagna actively pursued that defense. This is shown by the very fact that Lamagna contacted Miller. The only evident reason he would do so was because Cobb suggested to them that she would provide alibi evidence. Particularly after it became clear that Miller could not provide that alibi evidence and that Cobb's information was likely false, they certainly would have followed up with Boyington – if Cobb had given them as much information as he now claims. That they did not is strong evidence that the only information provided by Cobb was insufficient to find her.

For these reasons, the court finds that Bloomer worked with the information Cobb gave to him but was unable to locate the person whom Cobb said would provide an alibi. Bloomer cannot be faulted for this.

### Evidence of a motorcycle club and the defendant's criminal history

During the trial, witnesses made occasional references to the Iron Horsemen Motorcycle Club, with which Cobb was affiliated.[2] Also, one witness, Albert Severance, who was one of the admitted participants in the crime, testified that Cobb had a felony criminal record. Cobb argues here that the presentation of this evidence was improper and resulted from Bloomer's ineffective representation of him at trial. Here, the court separately addresses the two evidentiary issues.

First, the references to the motorcycle club arose in several different contexts. None of those references was improper, and none could be seen to cause prejudice of the

---

[2] In each instance, the group was identified as no more than a "club." It was not, for example, described as a motorcycle "gang."

4

magnitude that would entitle Cobb to relief here. Evidence of the organization arose through the testimony of a law enforcement officer who took a blood sample from the defendant after the defendant was charged with the crimes at issue here. The sample was to be used to analyze evidence obtained during the investigation. During that encounter, the defendant asked the officer if he wanted any information about the club. Additionally, evidence presented at trial suggested that prior to the crimes, Cobb met with several other people at the Iron Horsemen's clubhouse and had conversations directly related to the crimes. These included a conversation in which one of the perpetrators told Cobb that one of the alleged victims, Jeremy Hart, often possessed marijuana and cash at his house, and another conversation where Cobb and others planned the crimes. Further, after the crimes were committed, one of the perpetrators went to the clubhouse to burn the clothes that he and the others wore when they committed the crimes. This establishes that the references to the club during the trial were proper, because the club and the clubhouse were connected to the issues in the case. Further, this evidence was not inflammatory when measured either quantitatively or qualitatively. Thus, Bloomer did not fall short of his constitutional duty owed to Cobb by failing to seek exclusion of these references.

Second, Cobb argues that Bloomer is to be charged with Albert Severance's improper disclosure to the jury that he (Cobb) has a felony criminal record. The record reveals that the parties did take steps to shield the jury from such information. For example, Cobb waived his right to a trial by jury on the charge of possession of a firearm by a prohibited person. The court is willing to infer that Cobb proceeded jury-waived on this count to avoid presentation of evidence of his criminal record to the jury. Further, after Severance mentioned Cobb's record during testimony, counsel advised the court out of the jury's presence that prior to trial, the prosecutor had agreed to instruct the state's witnesses not to refer to that history and that the prosecutor in fact told prosecution witnesses not to disclose that information. This is also an evident attempt to prevent the disclosure of that criminal history information to the jury. It also demonstrates that Bloomer was aware of the issue and acted reasonably to protect Cobb from any prejudice that might arise from disclosure to the jury of his criminal history.

5

Nonetheless, during Severance's testimony to the jury, he disclosed that Cobb was a felon. This occurred when, on direct examination, he was asked where he had seen Cobb with a firearm that, according to the evidence, was used during the home invasion. Severance replied:

> The day that we got back with the gun from Clyde, it was – Walter [Cobb] had a duffel bag in the car, or we put it in a duffel bag when we got back to the house. He asked me if I'd keep that gun and the other gun at my house, because he was a felon, and I explained to him --.

Trial transcript vol. 2 at 156. Bloomer cut off Severance's answer with an objection, which the court sustained. After several more questions and answers, Bloomer requested a sidebar conference. There, the prosecutor confirmed that pursuant to his agreement with Bloomer, he had instructed the state's witnesses not to disclose the fact that Cobb had a felony record. Bloomer moved for a mistrial, which the court denied.[3] In light of that ruling, Bloomer requested the court to admonish the witness about the scope of his answers to questions posed by counsel. The court excused the jury and then instructed Severance to limit his answers to the immediate question.

Cobb has not proven that Bloomer's approach to this issue fell below the threshold of effective assistance of counsel. Prior to the commencement of trial, Bloomer took reasonable steps to preclude testimonial references to Cobb's felony record. He accomplished this by promoting Cobb's decision to waive his jury rights on the one charge that included an allegation of a felony criminal record. He also took steps to ensure that the prosecutor instructed the state's witnesses to avoid references to that history. When Severance disclosed that information to the jury, he did so spontaneously and not as part of a responsive answer on examination. Bloomer cannot be faulted for Severance's unsolicited and undisciplined response.

It also bears note that after Severance told the jury that Cobb was a felon, Bloomer responded to the problem in a sensible and accepted way. Rather than raising the issue immediately and highlighting the issue to the jury, he waited a short period of time and then sought a sidebar conference, where he raised the issue and sought relief.

---

[3] On appeal to the Law Court, Bloomer argued that the court erred when it denied the mistrial motion. The Law Court found no error in that ruling. *See State v. Cobb*, 2006 ME 43, ¶¶ 2, 3 n.4, 895 A.2d 972, 974.

The court finds that this aspect of Bloomer's representation of Cobb was not constitutionally deficient.

### Alternative suspect theory

Finally, Cobb contends here that Bloomer failed to secure further forensic testing on fingerprint and DNA evidence in order to enhance the argument that someone other than Cobb was the third robber.

The state subjected a number of items of evidence to forensic examination. A fingerprint examiner found prints of comparable value in the vehicle that the perpetrators used to flee the crime scene and on a plastic bag containing marijuana allegedly taken from the Harts' home. The examiner compared these unknown fingerprints to known prints of the Harts and the three alleged robbers, including Cobb. The examiner was not able to match the unknown prints to any of these known ones.

The state also performed DNA analyses on several items of evidence. The DNA examiner was able to secure useable DNA samples from some of that evidence, including the Harts' vehicle noted above, a flashlight taken from a duffel bag allegedly used during the robbery, the duffel bag itself, a plastic soda bottle that was used for target shooting with a firearm associated with the robbery, and a shotgun that Severance allegedly used during the robbery. The examiner compared these unknown samples with known samples that were taken from Cobb and the other two participants. Two of the unknown samples, including the one from the shotgun, matched the exemplar taken from Severance. The sources of the remaining DNA could not be determined. This meant that none of the samples taken from the evidence matched Cobb's DNA.

Cobb argues here that Bloomer should have pursued fingerprint and DNA analysis further in order to generate evidence affirmatively revealing the identity of the person who left that trace evidence behind. This argument fails for two reasons. First, it assumes that with further investigation, the fingerprints and DNA could have been matched with some particular person or persons. The unknown source of such evidence can be established only if it can be matched to the fingerprints or DNA from a person whose identity is known. Cobb has not presented any evidence that a forensic analyst would have able to match the unknown samples to known ones.

7

Second, Bloomer testified that he chose not to seek the additional testing as a strategic decision, because he concluded that the ambiguity created by the evidence was helpful and outweighed the risks that would arise from further analysis. As part of the defense case, Bloomer suggested that one David Chase was an alternative suspect. If Bloomer had arranged for further testing and if those test results did not match Chase's fingerprints or DNA, Bloomer's efforts to implicate Chase as an alternative suspect would have been compromised or undermined altogether. It was not unreasonable to conclude that the forensic evidence, as far as it went, was more helpful to Cobb simply by showing that he was not the source of that evidence, rather than by taking steps to learn who was that source. Strategic decisions made by trial counsel form the basis for post-conviction relief only if those decisions are "manifestly unreasonable." *See Pineo v. State*, 2006 ME 119, ¶ 13, 908 A.2d 632, 638. Bloomer's decision was reasoned and supported by an assessment of the risks and benefits associated with the available options.

The entry shall be:

For the foregoing reasons, the petition for post-conviction review is denied.

Dated: November 1, 2010

_____
Justice, Maine Superior Court

8

ATTORNEY FOR THE STATE

Gregory Campbell
Assistant District Attorney
97 Hammond Street
Bangor  ME  04401


ATTORNEY FOR THE DEFENDANT

Anthony Sineni Esq
701 Congress Street
Portland  ME  04102